# EXHIBIT "C"

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 16-24362-CIV-LENARD/GOODMAN

LUIS REYES and all others similarly
situated under 29 U.S.C. 216(b)
    Plaintiff,
vs.
COLLINS & 74TH STREET, INC.,
and MOHAMMED S. HOSSAIN,
    Defendants.
_____/

DEPOSITION
OF
LUIS REYES

Langbein & Langbein, P.A.
8181 Northwest 154th Street, Suite 105
Miami Lakes, Florida 33016

March 3, 2017
10:05 a.m. - 3:35 p.m.

## Page 2

APPEARANCES:
On Behalf of the Plaintiff:
JOSHUA SHESKIN, Esquire
Federal Disability Advocates
4300 Biscayne Boulevard, Suite 305
Miami, Florida 33137
(305)717-7530

On Behalf of the Defendant:
LESLIE LANGBEIN, Esquire
Langbein & Langbein, P.A.
8181 Northwest 154th Street, Suite 105
Miami Lakes, Florida 33016
(305)556-3663

Also present:
CHRISTINE TERASIUK, Interpreter
TASMIN KHAN

I-N-D-E-X
LUIS REYES                                    PAGE
Direct Examination by Ms. Langbein      03
Cross Examination by Mr. Sheskin        107
Redirect Examination by Ms. Langbein    119

E-X-H-I-B-I-T-S
EXHIBITS                                PAGE
Defendant's Exhibit No. 1               06
Defendant's Exhibit No. 2               29
Defendant's Exhibit No. 3               33
Defendan'ts Exhibit No. 4               34
Defendant's Exhibit No. 5               36
Defendant's Exhibit No. 6               37
Defendant's Exhibit No. 7               45
Defendant's Exhibit No. 8               54-55
Defendant's Exhibit No. 9               63
Defendant's Exhibit No. 10              70
Defendant's Exhibit No. 11              88
(Exhibits retained Ms. Langbein)

## Page 3

1  (Thereupon, the following proceeding was had:)
2      COURT REPORTER: Raise your right hand.
3  (Thereupon, CHRISTINE TERASIUK, the Interpreter, was
4  duly sworn to translate from English to Spanish and
5  from Spanish to English to the best of her ability:)
6  (Thereupon, LUIS REYES, a witness of lawful age, was
7  duly sworn under oath in accordance with the law and
8  testified as follows to the best of his ability:)
9      INTERPRETER: I do.
10     THE WITNESS: Yeah.
11     DIRECT EXAMINATION
12 BY MS. LANGBEIN:
13   Q  Okay. Good morning, Mr. Reyes. I
14 introduced myself before. I'm Leslie Langbein. I
15 represent the Defendants. Today is an opportunity
16 for the Defendants to ask you some questions about
17 your claim. It's called a deposition, if you've
18 never been in one before. So, it's important for
19 the witness to know a couple rules. If you answer a
20 question, you must answer it orally. You can't
21 shake your head, you can't say uh-huh or ah-huh.
22 Okay. Do we agree?
23   A  Yes.
24   Q  Okay. If I asked a question that you
25 don't understand, let me know and I'll be happy to

## Page 4

1  try and rephrase it. You are required today to
2  answer to the best of your ability. So, if you need
3  time to think about the answer to a question, just
4  let me know; I'll be happy to give you all the time
5  you need. Neither side wants you to guess. If you
6  don't know the answer to the question, just say I
7  don't know. If you don't remember, you can say I
8  don't recall. If later on you remember, I will
9  expect that you will say to me, 'Mrs. Langbein, I
10 remembered the answer to the question that you asked
11 me before.' Do we agree on all that?
12   A  Yes.
13   Q  Okay. And if you need a break at any
14 time, let me know and I -- if it's at a comfortable
15 breaking point, you know, you can go and you can
16 take a break. But now you're sworn under oath; you
17 cannot discuss your testimony, either that you've
18 given or you're about to give with any other person,
19 including your attorney. Agreed?
20   A  Yes.
21   Q  I may ask some questions today that you
22 find to be either offensive or intrusive, but
23 unfortunately, I get -- for you, I am entitled to
24 ask certain questions. The only questions I will
25 not ask you are regarding any conversations that you

1 (Pages 1 to 4)

```
 1   had with your attorney.  So, your attorney has the
 2   right to make objections this morning, but the only
 3   objection where he will put his hand over your mouth
 4   with be, 'Objection, attorney/client privilege.'
 5   Don't talk to us about anything you told or you
 6   discussed with your attorney.  So, any other
 7   objection you -- he's going to make that just for
 8   the record, but you must answer the question if you
 9   understand it.
10           MR. SHESKIN:  But if you don't understand
11       it, just tell her.  She's very nice.
12           MS. LANGBEIN:  That's what everyone
13       thinks.
14   BY MS. LANGBEIN:
15       Q   Okay. Mr. Reyes, would you tell your full
16   name for the record?
17       A   Luis Reyes Vargas.
18       Q   When you sign documents, do you use just
19   Luis Reyes or Luis Vargas?
20       A   No, Luis Reyes.
21       Q   I have your Social Security number.  So,
22   I'm not going to take it on the record.  Mr. Vargas
23   -- Mr. Reyes, excuse me. I'm going to hand you a
24   piece of paper and a pen, and I'm going to ask you
25   to print your name.  We're going to make this
```

Page 5

```
 1   Defendant's Exhibit No. 1.
 2   (Whereupon, the documents are marked as Defendant's
 3       Exhibit No. 1 for identification.)
 4           MS. LANGBEIN:  Yeah, and we'll make copies
 5       of it later.
 6   BY MS. LANGBEIN:
 7       Q   All right. Would you tell me please, sir,
 8   your current home address?
 9       A   387 71st Street, Miami Beach, 33141.
10       Q   Is that a home or an apartment?
11       A   It's a home.
12       Q   Do you rent or own that?
13       A   Rent.
14       Q   Who is your landlord?
15       A   Joaquin Alonso (phonetic).
16       Q   With a Z or an S?
17       A   I don't know.
18       Q   Okay. How much do you pay in rent?
19       A   Five fifty.
20       Q   Do you reside with anyone else?
21       A   No.
22       Q   Have you ever resided at that address with
23   anyone else?
24       A   No.
25       Q   Now you gave me another address in
```

Page 6

```
 1   response to interrogatories, and you told me that
 2   you live with a roommate. So, I'm a little confused.
 3   Can you explain the difference?
 4       A   Well, the difference is the other address
 5   of the other lady, Aleida Lima (phonetic). (sic)
 6       Q   I asked you what your current address was
 7   and you told me that you lived with Ms. Aleida --
 8   with Ms. Lima.
 9       A   But I leave that address -- oh, but my
10   current address is over there with Joaquin Alonso.
11       Q   Interrogatory number three was I asked you
12   to identify each and every address where you resided
13   during the relevant time period and give the full
14   name of all individuals with whom you resided at
15   such address, and you answered your current address
16   was 1576 71st Street, Miami Beach, and your mailing
17   address was 387 71st Street.
18       A   Yes.
19       Q   Well, when I just asked you where you
20   resided, you told me 38 -- the 387 address, but
21   here, you have it only as a mailing address.  So,
22   what's the difference in your testimony?
23       A   Well, because I live with Aleida Lima.
24       Q   Then your current address in response to
25   Interrogatory Three should have been -- okay -- I'm
```

Page 7

```
 1   -- during this deposition when I asked you where do
 2   you reside, you told me 387.  So, just tell me on
 3   the record which is the one where you physically
 4   good to sleep every night.
 5       A   1576 of 71st Street in Miami Beach.
 6       Q   Okay.  How long have you lived at the 1576
 7   address?
 8       A   It's been like eight or nine years.
 9       Q   So, are you paying rent in two different
10   places?
11       A   No.
12       Q   During the entire period that you worked
13   for my client where you're claiming overtime, did
14   you live with Ms. Lima?
15       A   Yes.
16       Q   Is she your girlfriend?
17       A   No.
18       Q   What is her relationship to you?
19       A   None.
20       Q   Why would you maintain an apartment on 387
21   71st Street and at the same time -- which -- for
22   which you pay rent, and also live someplace else?
23   (sic)
24       A   Well, no because I live over there, but
25   there -- it -- the houses are close to each other.
```

Page 8

2 (Pages 5 to 8)

```
 1  States?
 2      A   Cousins and such, but I don't even know
 3  their addresses.
 4      Q   Okay.  Let's talk a little bit about your
 5  son's mother and your son.  Do you send money back
 6  to Cuba to support them?
 7      A   Yes.
 8      Q   How often?
 9      A   Every two or three months.
10      Q   How much do you usually send over to Cuba?
11      A   A hundred, two hundred.
12      Q   When you go to make the remittance, where
13  do you go to do that?
14      A   An agency that's over here in Hialeah.
15      Q   Where in Hialeah?
16      A   It's on Palm Avenue. I know how to get
17  there, but I don't know the address.
18      Q   Is it near the City Hall and the
19  courthouse?
20      A   No.
21      Q   Is it closer to 49th Street?
22      A   Yes. That's over by like Le Jeune, like
23  7th or 9th, and it's in front of a Sedano's.
24      Q   So, off of East 4th in Hialeah?
25      A   When you come off of 79th and you get to
```
Page 21

```
 1  the horse racing place, the casino, and so you
 2  follow the train tracks straight over there.
 3      Q   Okay. Did you ever pick up anybody to go
 4  to work when you were working for Collins & 74th?
 5          INTERPRETER:  Working for Collins?
 6          MS. LANGBEIN:  Okay.  Let me -- let me
 7      rephrase the question.
 8  BY MS. LANGBEIN:
 9      Q   During the period of time for which you're
10  seeking overtime, did you ever give another worker a
11  ride to work?
12      A   Sometimes, yes.
13      Q   Who would that be?
14      A   They worked in the kitchen.
15      Q   Who were they?
16      A   Well, one is named Fermin (phonetic) and
17  the other, they call him Meecho (phonetic).
18      Q   Meecho?
19      A   I don't know who to say it.
20      Q   Okay. How often would you pick them up to
21  take them to work?
22      A   Well, when I would see that they were
23  walking.
24      Q   Did they work the same shift that you
25  worked?
```
Page 22

```
 1      A   Yes.
 2      Q   Who else worked the same shift that you
 3  worked?
 4      A   Francisco.
 5      Q   And?
 6      A   Another Francisco.
 7      Q   Okay.
 8      A   Wilmer.
 9      Q   Anyone else?
10      A   The others have left. Eduardo, Javier, and
11  Olga also worked; Julie, Leslie, and some others.
12      Q   All right. When you would get there in the
13  morning who was the morning manager?
14      A   It was always Tasmin.
15      Q   Okay. And what time did she leave during
16  the day?
17      A   At four or five, around there.
18      Q   Did she work with any other managers at
19  the same time?
20          INTERPRETER: Did she, or did --
21          MS. LANGBEIN: I'm sorry --
22  BY MS. LANGBEIN:
23      Q   Did Tasmin work with any other managers at
24  the same time?
25      A   Corrine.
```
Page 23

```
 1      Q   And anyone else?
 2      A   There were like four more, that's it.
 3  Cachin (phonetic), Suey (phonetic), Cachin, they
 4  were managers.
 5      Q   So, there were always two managers at
 6  least on duty during the time that you worked?
 7      A   Yes.
 8      Q   Besides the rent that you paid to Ms.
 9  Lima, what other monthly expenses did you have?
10      A   Car insurance.
11      Q   How much was that?
12      A   Seventy-five dollars, but the --
13      Q   A week?
14      A   Per month.
15      Q   Wow. I have to find out who you're
16  insured with.
17          MR. SHESKIN:  It is a '95 Ford Explorer.
18  BY MS. LANGBEIN:
19      Q   Okay. Your telephone is your cell phone
20  you're talking about?
21      A   Yes.
22      Q   How much did you pay for that each month?
23      A   For the what?
24      Q   Cell phone?
25      A   Fifty-three.
```
Page 24

6 (Pages 21 to 24)

```
 1     Q    That was with Metro PCS?
 2     A    Yes.
 3     Q    Okay. Any other expenses?
 4     A    The rent? No, those three.
 5     Q    Food?
 6     A    Well, of course.
 7     Q    How much did you pay a month for food?
 8     A    Well, I don't know; whatever I felt like
 9  buying.
10     Q    Did you buy food at the store? At my
11  client's store?
12     A    Sometimes.
13     Q    Did you always eat out, or did you cook
14  for yourself in Ms. Lima's house?
15     A    I would cook.
16     Q    Did you have to pay utilities at Ms.
17  Lima's house?
18     A    No.
19     Q    And then you've already talked to us about
20  the one hundred to two hundred dollars that you
21  would send to your son.
22     A    Yes.
23     Q    Did you send money to anyone else in Cuba?
24     A    My whole family practically lives in Cuba.
25     Q    Okay. But I asked you 'Did you send money
                                                Page 25
```

```
 1  to anyone else in Cuba?'.
 2     A    Yes.
 3     Q    Who else?
 4     A    My mom.
 5     Q    How much did you send her?
 6     A    The same almost always.
 7     Q    About one hundred to two hundred dollars
 8  every two to three months?
 9     A    Yes.
10     Q    Okay. When you went to Cuba to visit them,
11  did you also bring gifts?
12     A    Yes.
13     Q    How much would you usually spend in gifts
14  when you went to visit?
15     A    Well, supposedly the cost of the gift
16  depending on who it was for.
17     Q    Did you ever spend more than two hundred
18  dollars on gifts to take to Cuba?
19     A    Yes.
20     Q    Did you ever spend more than five hundred
21  dollars to take gifts to Cuba?
22     A    No.
23     Q    Did you ever spend more than four hundred?
24     A    No.
25     Q    So, was it some place between two hundred
                                                Page 26
```

```
 1  and three hundred dollars that you would spend each
 2  time?
 3     A    Yes.
 4     Q    Okay. What other expenses that you can now
 5  remember? (sic)
 6     A    Medications and things I needed.
 7     Q    What kind of medication?
 8     MR. SHESKIN: Objection.
 9     THE WITNESS: Advil, Bengay -- the old man
10  was sick for three years, and that cost money.
11  My dad.
12  BY MS. LANGBEIN:
13     Q    Back in Cuba?
14     A    Yes.
15     Q    Okay. We're talking about you. Advil and
16  Bengay, that sounds like you work out someplace; go
17  to a gym?
18     A    No.
19     Q    Do you have an injury that you had to take
20  Bengay and Advil for?
21     A    I've never taken medication.
22     MR. SHESKIN: I believe he was talking
23  about his father or something in Cuba.
24  BY MS. LANGBEIN:
25     Q    Okay. When -- when you told me Advil and
                                                Page 27
```

```
 1  Bengay, were you talking about yourself or your
 2  father?
 3     A    For my dad, for my family.
 4     Q    So when you went over you, would bring
 5  those type of medications back to Cuba?
 6     A    Yes.
 7     Q    All right.
 8     A    Or I would send them.
 9     Q    All right. Any other monthly expenses that
10  you haven't told me about?
11     A    No.
12     Q    All right. Was there a time before 2013
13  that you used to work for my client?
14     A    Was there?
15     Q    Do you recall that there was a time before
16  you started working for my client in 2013 that you
17  previously worked for them?
18     A    No, I don't remember.
19     Q    How did you get the job in 2013 at Collins
20  & 74th?
21     A    I worked over here in a -- in a
22  supermarket and it got sold.
23     Q    What supermarket was that?
24     A    They used to call it El Norman's, and now
25  it's Tropicale.
                                                Page 28
```

7 (Pages 25 to 28)

**Page 29**

1  Q  Normandy (phonetic) Market?
2  A  Yes.
3  Q  Okay. Let me just see if I can find his
4  tax returns real quick. Okay.
5      MS. LANGBEIN: I'm going to show you what
6  we're going to mark as Defendant's No. 2.
7  Maybe not. I don't think my assistant made
8  copies of it. So, I'm just going to show you
9  the 2013 tax return which we've marked as
10 Defendant's No. 2. Oh, wait. Here it is. Go
11 ahead. Can you show that to your client?
12 (Whereupon, the documents are marked as Defendant's
13      No. 2 for identification.)
14 BY MS. LANGBEIN:
15 Q  All right. Sir, that is the 2013 tax
16 return that you have provided to me. If you will,
17 turn to the very back. There are three W-2's that
18 are attached. So, let's look at the first one.
19     MS. LANGBEIN: Josh, I can't read upside
20 down; can you tell me who that was from? Is
21 that the $550?
22     MR. SHESKIN: Art Deco Supermarket of
23 Normandy.
24 BY MS. LANGBEIN:
25 Q  Okay. So, Normandy Market, when did you

**Page 30**

1  start to work for Normandy Market in 2013?
2  A  I don't remember now.
3  Q  Okay. And what was your job there?
4  A  Dairy/frozen.
5  Q  How much were you paid by Normandy Market?
6  A  I think eight -- $9.50, I believe.
7  Q  And why did you leave that job? Because
8  it was sold?
9  A  It was sold.
10 Q  Did you work overtime there?
11 A  Yes.
12 Q  Were you paid at an overtime rate?
13 A  They didn't pay overtime.
14 Q  They paid you straight time?
15 A  Yes.
16 Q  How many hours a week did you work there?
17 A  Well, almost always, I would work from
18 7:00 a.m. to 5:00 p.m.
19 Q  So, the same hours that you had with my
20 client?
21 A  Yes.
22 Q  Okay.
23     MS. LANGBEIN: Now, Josh, would you be so
24 kind as to turn over the next -- and I think
25 that is going to be for five hundred and --

**Page 31**

1      MR. SHESKIN: I'll help you out. Wait,
2  that says 9915.
3      MS. LANGBEIN: Okay. That's my client, so
4  there's another one, then.
5      MR. SHESKIN: Oh, okay. Then it was on
6  this page and it's Art Deco Supermarket at
7  Normandy for forty-five forty. I think it's
8  the same.
9      MS. LANGBEIN: No, there's three of them.
10 Now, we're cooking.
11 BY MS. LANGBEIN:
12 Q  There is a W-2 statement from something
13 called CIPPEO2 Inc. for $572.22. Who did you work
14 for at that period of time?
15 A  Where?
16 Q  Why did you get a W-2 for five hundred and
17 seventy-two dollars?
18 A  It must be that I worked at another place,
19 but I don't remember.
20 Q  Do you -- do you remember working for
21 anyplace in 2013 besides Normandy Market and my
22 client?
23 A  Well, at one point I was working Bay
24 Supermarket, but.
25 Q  Where is that located?

**Page 32**

1  A  Over there, close by Normandy.
2  Q  How long did you work for Bay Supermarket?
3  A  I don't remember. It was a short time,
4  but I don't remember.
5  Q  Okay. So now can you give me the order in
6  2013 of when you worked for these employers? Which
7  employer was first, which was second, and which was
8  third?
9  A  Normandy, Bay Supermarket, and M and L.
10 Q  In this lawsuit you're claiming that you
11 worked sixty-five hours for my client each every
12 week during the period of time that you're seeking
13 overtime. Did you see the Statement of Claim before
14 it was filed?
15 A  Yes.
16     MS. LANGBEIN: This one I just found --
17 excuse me, just go off the record for a moment.
18 (Thereupon, a discussion was held off the record and
19     the proceeding continued as follows:)
20 BY MS. LANGBEIN:
21 Q  And I'm sorry, I was talking, I didn't --
22 wasn't listening to the answer. Did you say you had
23 not seen the Statement of Claim that was filed in
24 court before it was filed?
25     MR. SHESKIN: He said he did.

8 (Pages 29 to 32)

81ad335e-c69b-4ce2-b4b9-0ea8c9849737

**Page 33**

1    THE WITNESS: I did see it.
2    MS. LANGBEIN: All right. So, now we're
3    going to make this Defendant's No. 3.
4    (Whereupon, the documents are marked as Defendant's
5       No. 3 for identification.)
6    BY MS. LANGBEIN:
7    Q  All right. I'm thinking you're going to
8    have to help him a little bit with the translation
9    of this document.
10       So, this reads that you're claiming
11   overtime starting October 14, 2013 through October
12   14, 2016, and you're claiming that you worked
13   twenty-five extra hours each and every week. Is
14   that what you're claiming in this case?
15   A  How many?
16   Q  Twenty-five extra hours each and every
17   week?
18   A  Yes.
19   Q  When you first started working for my
20   client, you were not paid $9.50 an hour, correct?
21   A  Yes.
22   Q  Okay. So, your testimony is from October
23   2013 through October 2016, you always got paid at
24   $9.50 an hour?
25   A  Yes.

**Page 34**

1    Q  Okay. And you're certain that you worked
2    three full years for my client?
3    A  I think so.
4    Q  Now, let's talk a little bit about the
5    passport that you showed me this morning. You left
6    the United Stated on at least two occasions while
7    you were working for my client, correct?
8    A  Yes.
9    MS. LANGBEIN: This is No. 4. And I'll
10      check and see if Connie has scanned it so we
11      can return the original to you.
12   (Whereupon, the documents are marked as Defendant's
13      Exhibit No. 4 for identification.)
14   BY MS. LANGBEIN:
15   Q  So, does the hundred and fifty-six weeks
16   that you're claiming, does that also include the
17   time that you took off to go to Cuba? (sic)
18   A  Yes.
19   Q  So, you're claiming overtime even though
20   you took off to go to Cuba?
21   A  No.
22   Q  Okay. So, would you agree with me it could
23   not be a hundred and fifty-six weeks?
24   A  I don't know what it is.
25   Q  Okay. Well, if we look at the visas on

**Page 35**

1    your passport, can we agree that those should not be
2    -- the time that you were in Cuba should not be
3    counted towards the hundred and fifty-six weeks,
4    right?
5    A  No. Because I didn't work.
6    Q  Correct. So, when you saw a hundred and
7    fifty-six weeks, you knew that was incorrect?
8    A  I don't know any of that.
9    Q  That's why I asked you if you had reviewed
10   this before you filed it in court, because clearly
11   you have filed a document that has the wrong amount
12   of weeks, right?
13   MR. SHESKIN: Objection.
14   BY MS. LANGBEIN:
15   Q  Right?
16   A  Well, if it's that, I mean, if I didn't
17   work -- work, then it shouldn't be in there.
18   Q  Correct. Okay. Now, the -- I'm going to
19   show you documents which are paychecks -- paycheck
20   stubs that you produced to me.
21   MR. SHESKIN: Is this Exhibit 4, or?
22   MS. LANGBEIN: This is going to be Exhibit
23      5.
24   MR. SHESKIN: Was 4 the passport?
25   MS. LANGBEIN: 4 is the passport.

**Page 36**

1    (Whereupon, the documents are marked as Defendant's
2       Exhibit 5 for identification.)
3    BY MS. LANGBEIN:
4    Q  Did you -- are these the only paystubs
5    that you saved from the time that you worked for my
6    client?
7    A  Yes.
8    Q  Did you have others, and they were just
9    thrown away when you -- or they were just thrown
10   away?
11   A  Yes.
12   Q  Have you seen the paychecks that we
13   produced to you?
14   A  Yes.
15   Q  Do you recall that in 2013 you were paid
16   $8.25 an hour?
17   A  Perhaps.
18   Q  Okay. So, the Statement of Claim is also
19   incorrect as to the amount you've listed because you
20   weren't paid $9.50 an hour during this entire
21   three-year period, correct?
22   A  Well, I ended up getting $9.50. I don't
23   know when that began.
24   Q  But not during the entire period of time
25   for which you're seeking overtime?

**Page 37**

1  A   What?
2  Q   I'll withdraw the question. Do you have a
3  recollection that you received that raise in 2015?
4  A   I don't remember when it was.
5  Q   Let's look at the exhibit that has the
6  paychecks and the timecards.
7      MS. LANGBEIN: We'll make that Defendant's
8  No. 6.
9  (Whereupon, the documents are marked as Defendant's
10     No. 6 for identification.)
11     MS. LANGBEIN: Why do I only have one of
12  those? Do -- do you see anything on the table
13  that looks like -- that's what I hate about
14  these cases. There's too much paper, too much
15  paper. Maybe they're under here. No. No. No.
16  No. No. No. You see another big packet that
17  looks like that? No. No. All right.
18  BY MS. LANGBEIN:
19  Q   We'll just show this to the witness, and
20  this is Defendant's No. 6. Okay. Would you -- would
21  you take your time and go through these documents?
22  They're Bate stamped one through sixty-eight, I
23  believe -- sixty-seven. Would you kindly look
24  through them? Let's start with page sixty-seven.
25  A   Sixty-seven?

**Page 38**

1  Q   Yes, it's the very last page. Okay. Is
2  that your signature on the bottom of each of those
3  timecards?
4  A   Yes.
5  Q   Okay. Do you see that you appear to be
6  working a schedule of Thursday, Friday, Saturday,
7  Sunday, and one extra day?
8  A   Yes.
9  Q   Okay. And in each of those two weeks, you
10  worked five days, correct?
11  A   Six days.
12  Q   Okay. What was the sixth day that you
13  worked?
14  A   Well, no, here it only shows four days.
15  Q   Five days.
16  A   Huh?
17  Q   Do you recall now that the first day you
18  worked for my client, the first punch in, is October
19  31, 2013?
20  A   Well, here, there's five days.
21  Q   Okay. The question is, do you recall that
22  the very first day you worked for my client in 2013
23  was October 31st?
24  A   No, I don't remember.
25  Q   Do you have anything in your possession

**Page 39**

1  that shows differently?
2  A   No, like what?
3  Q   I guess that's the answer. Okay. So, in
4  the very beginning, you were working for my client
5  five days a week, correct?
6  A   Always six.
7  Q   Okay. So, on these timecards, which was
8  the additional day that you worked that's not
9  reflected on the timecard?
10  A   Well, the other ones that was punched in
11  on paper. (sic)
12  Q   Okay, we're going to get to that. What --
13  so what extra day of the week was it that you
14  worked?
15  A   Six days.
16  Q   Monday, Tuesday, Wednesday, what was the
17  extra day that you claim is not on these timecards?
18  A   The other two days.
19      MR. SHESKIN: What were those days? What
20  days of the week?
21     MS. LANGBEIN: I thought I made that
22  clear. Coming from your mouth, maybe.
23     THE WITNESS: Well, it could have been
24  either a Saturday or a Sunday.
25  BY MS. LANGBEIN:

**Page 40**

1  Q   But you're clocked in on Saturday and
2  Sunday.
3  A   Well, yeah, because punching in here was
4  just punching in four days. It didn't matter what
5  days it was.
6  Q   But you're punched in five days.
7  A   Well, there's an extra day.
8  Q   Okay. And who do you claim told you in the
9  beginning that you should work this extra day and
10  not punch in?
11  A   The owner.
12  Q   So, you're claiming that Mohammed told you
13  that on hire that you should not punch in on the
14  extra day?
15  A   Of course, because they -- they weren't
16  paying overtime.
17  Q   Are you claiming you were getting paid
18  straight time for that extra day that you didn't
19  punch in?
20  A   Yes.
21  Q   Okay. Does it come to your recollection
22  now that you worked for my client a long time before
23  you came back to work with them?
24  A   What?
25  Q   How long have you lived in Miami Beach?

10 (Pages 37 to 40)

**Page 53**

1  Q  Did you review these timecards and the
2  paychecks before you got here today?
3  A  Huh?
4  Q  Before you got here today, did you review
5  any documents?
6  A  No.
7  Q  Did you ever see a poster in my client's
8  store that talked about the wage and hour laws,
9  overtime?
10  A  No.
11  Q  When you got a paycheck such as the one
12  that shows on the bottom of Defendant's No. 6, what
13  did you do with the paycheck?
14  A  The check that I would get?  I would cash
15  it.
16  Q  Where?
17  A  At the bank.
18  Q  Which bank?
19  A  Regions Bank.
20  Q  Did you ever deposit any of the monies?
21  A  Bank of America. Chase.
22  Q  I don't think we were told about a Bank of
23  America account. I'll have to check.
24  MR. SHESKIN:  Okay. If not, let me know.
25  BY MS. LANGBEIN:

**Page 54**

1  Q  Did you ever deposit any of your pay into
2  any of these accounts?
3  A  No.
4  Q  Where did you -- so you always went to a
5  bank to cash them?
6  A  Yes.
7  Q  Would you agree with me -- going back to
8  Defendant's No. 6, which is this whole packet of
9  paychecks and timecards, that that is your signature
10  on the bottom of each timecard?
11  A  Yes.
12  Q  And you've had an opportunity to look at
13  each and everyone of these pages one through
14  sixty-seven?
15  MS. LANGBEIN:  Let the record reflect that
16  the witness is going through page by page of
17  Exhibit 6. (sic)
18  BY MS. LANGBEIN:
19  Q  Did you have a chance to look at them?
20  A  Yes.
21  Q  Okay. Are those all your signatures on the
22  bottom of those timecards?
23  A  Yes.
24  Q  All right. Let's go to Exhibit No. 8.
25  (Whereupon, the documents are marked as Defendant's

**Page 55**

1  Exhibit No. 8 for identification.)
2  BY MS. LANGBEIN:
3  Q  Do you recognize Exhibit No. 8 as a
4  document that you produced to my client?
5  A  Of this?
6  Q  Yeah. How did you get a copy of your
7  timecard?
8  A  I took a photocopy.
9  Q  Where did you take a photo -- where did
10  you make the photocopy?
11  A  Right there at work.
12  Q  Okay. Is this -- why did you copy this
13  timecard?
14  A  To have this, you know, the forty hours
15  punched on the timecard.
16  Q  Had you made the decision to quit when you
17  made the copy of this timecard?
18  A  No.
19  Q  So why, then, did you suddenly make a copy
20  of a timecard?
21  A  Like something I wanted to have.
22  Q  Did someone tell you to make the copy of
23  your timecard?
24  A  No.
25  Q  Was this the last week that you worked for

**Page 56**

1  my client?
2  A  I think so.
3  Q  So, October 2nd was the last time that you
4  clocked in?
5  A  Clocked in where?
6  Q  The last date shown is October 2nd; is
7  that the last time you clocked in?
8  A  The day that I left?
9  Q  Yes.
10  A  Yes.
11  Q  So then this statement of claim also has
12  to be amended to reflect the true date that you left
13  my client's employment, correct?
14  A  Yes.
15  Q  Well, if you wanted to make a copy of your
16  timecard, why didn't you make and keep copies of the
17  extra punch -- punches that you made each and every
18  week?
19  A  That's there.
20  Q  This is one, apparently.  Where's the
21  others?  Why didn't you make copies --
22  A  That would be handed in and they would
23  throw it away.
24  Q  Why didn't you make a copy of the one you
25  punched in before you handed it in like you did with

```
 1      Q    Andres Montes Reyes?
 2      A    No.
 3      Q    So your testimony today is you just met
 4  Andrew Montes Reyes at New Generation?
 5      A    Who is Andres Montes Reyes?
 6      Q    I just asked you before if you worked with
 7  him at New Generation and you said yes, you do.
 8      A    With who?
 9      Q    Okay. Let -- let's make sure that you're
10  listening closely to the question, because it's
11  really important that we get the right answer to the
12  questions. When you worked at Collins & 74th, did
13  you work with a person named Jorge Andres Montes
14  Reyes?
15      A    No.
16      Q    Okay. So, at New Generation where you
17  currently work, do you work with that person?
18      A    I don't know that person.
19      Q    Okay. That's fine. Do you also send money
20  to Cuba for your father?
21      A    Well, I don't send it anymore, because
22  he's dead.
23      Q    Oh, I'm sorry to hear that. When did he
24  pass?
25      A    In July of last year.
```

Page 61

```
 1      Q    So, that would have been July 2016?
 2      A    Yes.
 3      Q    Did you go to Cuba to attend his funeral?
 4      A    No.
 5      Q    During the time he was alive and you were
 6  working for Collins & 74th, did you routinely send
 7  your father money in Cuba?
 8      A    Money and medicine.
 9      Q    Was that separate, then, the money that
10  you sent your mother?
11      A    No.
12      Q    They were living together?
13      A    Yes.
14      Q    Okay. Did you ever get any loans from
15  anyone when you worked at Collins & 74th? Let's --
16  strike that. That's a real bad question. Did you
17  ever get any loans from someone in management at
18  Collins & 74th? Well, let's start with the first
19  one. Did you ever ask for a loan?
20      A    No.
21      Q    Did you ever receive any loan?
22      A    No.
23      Q    Okay.
24           MS. LANGBEIN: Let's look at your 2015 tax
25      return, which we're going to mark as
```

Page 62

```
 1      Defendant's Exhibit No. 9. Let's see if I can
 2      find another copy. I know there's another copy
 3      somewhere.
 4           MR. SHESKIN: That's Exhibit 9, you said?
 5           MS. LANGBEIN: Nine, yeah. Here it is.
 6      Too much paper.
 7  (Whereupon, the documents are marked as Defendant's
 8      Exhibit No. 9 for identification.)
 9  BY MS. LANGBEIN:
10      Q    Okay. Now, in 2015, you got the raise to
11  $9.50, correct?
12      A    I don't remember what month it was. I
13  don't remember when it was.
14      Q    Well, we can look at the paychecks and we
15  can tell. What happened to them? They're in front of
16  him.
17      A    This one?
18      Q    No. Actually, this is an exhibit that you
19  need. Okay. Let's look at pages forty and
20  forty-one. You see that on page forty -- forty-one,
21  you were earning $8.25 an hour, right?
22      A    Yes.
23      Q    And when you come back -- and there's a
24  period of time you're not working at the store, and
25  when you come back in March, your rate increased to
```

Page 63

```
 1  $9.50, correct?
 2      A    Yes.
 3      Q    Okay. And were you still working the
 4  sixty-five hours a week during 2015?
 5      A    Yes.
 6      Q    Okay. And that's the only place that you
 7  worked in 2015?
 8      A    Yes.
 9      Q    You had no side jobs?
10      A    No.
11      Q    And you didn't get cash from any other
12  employer?
13      A    No.
14      Q    Have you filed your 2016 tax return yet?
15      A    Yes.
16      Q    Did you get a W-2 from Collins & 74th?
17      A    Yes.
18      Q    Okay. Did the days off that you -- strike
19  that. Did the additional days that you claimed to
20  have worked each week ever change from 2014 to 2015?
21      A    No.
22      Q    So, those would have still been Tuesday or
23  Wednesday, according to what you're telling me?
24      A    Yes.
25      Q    Did you ever request to work less hours?
```

Page 64

16 (Pages 61 to 64)

**Page 81**

```
 1      Q   Then why did you write that down as your
 2   answer to interrogatory 2B?
 3      A   Well, because the payment was -- well, if
 4   the check was for forty hours -- and so, you know,
 5   adding to that, the cash would be -- well, without
 6   counting the discounts that are taken out of the
 7   check with the cash, it adds up to about a thousand,
 8   eleven hundred.
 9      Q   Each week you were getting eleven hundred
10   -- each two weeks you were getting eleven hundred
11   dollars?
12      A   Yes.
13      Q   And that was cash you were not depositing
14   in the bank, right?
15      A   Yes.
16      Q   So, what proof do you have of the fact
17   that you got paid eleven hundred dollars every two
18   weeks?
19      A   Well, that was the hours that I worked.
20      Q   I have to go get a calculator, because I
21   can't add worth a damn. So I'll be right back. Just
22   bear with me.
23      (Thereupon, a discussion was held off the record and
24          the proceeding continued as follows:)
25
```

**Page 82**

```
 1   BY MS. LANGBEIN:
 2      Q   Okay. For -- I'm looking at the year
 3   2015, when you were earning $9.50 an hour. So,
 4   $9.50 times sixty-five equals $617.50. So, if I
 5   double that, that comes to $1235.00. Does that mean
 6   you were getting somewhere around $475 in cash?
 7      A   Yes.
 8      Q   I thought you just told me you were
 9   getting twelve hundred dollars in cash?
10      MR. SHESKIN:  I believe he said eleven.
11      MS. LANGBEIN:  Whatever.
12      THE WITNESS:  Because if you -- if the
13   extra hours go over forty hours, then it's more
14   money.
15   BY MS. LANGBEIN:
16      Q   Yeah, I already multiplied it by
17   sixty-five, because you are claiming that you got
18   paid straight time for all your hours, right?
19      A   Yes.
20      Q   All right. Now, tell me one more time: How
21   many hours are you claiming that you worked each and
22   every week?
23      A   The extra hours that aren't on the
24   timecard.
25      Q   Yeah, I'm asking you for the number. How
```

**Page 83**

```
 1   many?
 2      A   It could be more than forty every two
 3   weeks -- every fifteen days.
 4      Q   How many hours each week do you claim you
 5   worked?
 6      A   Twenty-some hours.
 7      Q   Okay. So, why in your statement of claim
 8   did you say it was sixty-five?
 9      A   Well, because before I would come in at
10   seven in the morning and leave at eleven at night.
11      Q   Well, this is new. When did that happen?
12      A   Well, that's -- that's not -- well, over
13   there at the house, I have a piece of paper where I
14   was writing everything down.
15      Q   Should I terminate this deposition now?
16      MR. SHESKIN:  We'll get you the piece of
17   paper.
18      MS. LANGBEIN:  I am not going to terminate
19   this deposition at all. Okay? I am going to
20   seek sanctions, okay? Why was this not handed
21   over to me?
22      MR. SHESKIN:  Because it wasn't handed
23   over to us, and we certainly asked. In fact, I
24   personally did.
25      MS. LANGBEIN:  When did you start --
```

**Page 84**

```
 1   BY MS. LANGBEIN:
 2      Q   When did you start keeping track of your
 3   hours?
 4      A   Always.
 5      Q   Why didn't you give that paper to your
 6   lawyers?
 7      A   Because that's way before.
 8      Q   That's back when you used to work for them
 9   the first time, correct?
10      A   No, now.
11      Q   Sir, I am thoroughly confused. You just
12   told me you -- that was way before. I'm certain
13   that's what the transcript is going to show; those
14   words, "That was way before."
15      A   Well, that was a while ago, but it wasn't
16   that long ago either.
17      Q   When did you start keeping track of your
18   hours?
19      A   I've always had the same hours.
20      Q   What are they written down on?
21      A   On the cards.
22      Q   Are you talking about the timecard, or are
23   you talking about a card that you keep at home?
24      A   No, no, no.  No, that was a paper when I
25   was going -- coming in at 7:00 a.m. and leaving at
```

21 (Pages 81 to 84)

**Page 85**

```
 1      11:00 p.m.
 2   Q  When did that happen?
 3   A  I don't remember.
 4   Q  How many times did it happen?
 5   A  That was like a week and some.
 6   Q  So, it happened one week?
 7   A  A week and a bit.
 8   Q  Did that happen the first year that you
 9  worked for my client in 2013?
10   A  I don't remember.
11   Q  Well, did it happen in 2014?
12   A  I don't remember the date.
13   Q  If I gave you calendars for the years and
14  you looked at them, would you be able to pinpoint
15  the week that you claimed to have worked till eleven
16  o'clock at night?
17   A  I don't know.
18   Q  Would you like me to go get calendars? I
19  can run them off real quick.
20   A  Well, no, because that paper that I have
21  at my house has nothing to do with that. It's --
22  it's similar to the one where the -- the punch --
23  punch numbers are in.
24       MS. LANGBEIN: Let the reflect -- record
25   reflect that I'm staring at my opposing counsel
```

**Page 86**

```
 1  quizzically.
 2       MR. SHESKIN: I don't understand what he
 3   is saying either. I'm confused.
 4  BY MS. LANGBEIN:
 5   Q  What occasioned you to work till eleven
 6  o'clock at night during this particular week?
 7   A  Because there were no people at -- in the
 8  meat department.
 9   Q  So, you were working in the meat
10  department?
11   A  Yes.
12   Q  What were you doing in the meat
13  department?
14   A  Everything.
15   Q  Well, give me an idea who you were working
16  with?
17   A  Well, I don't remember who the manager was
18  there. I think his name was Vladimir, I don't know.
19   Q  Vladimir, okay. So, it wasn't one of the
20  witnesses who you've named who worked in the meat
21  department?
22   A  No.
23   Q  So, it wasn't Mr. Perez, right?
24   A  No.
25   Q  Or a Mr. Maximo Hernandez?
```

**Page 87**

```
 1   A  No, not him either.
 2   Q  And you said this was a week only?
 3   A  One week.
 4   Q  All right. So -- and you kept track of
 5  those hours on a little piece of paper that's
 6  similar to Defendant's No. 7?
 7   A  Yes, every day I would write down from
 8  7:00 till 11:00 at night.
 9   Q  Who was the store manager working during
10  that week?
11   A  It must have been Corrine, who was always
12  there.
13   Q  Other than that week, how many hours did
14  you normally work each week?
15   A  Sixty-some hours.
16   Q  We've already gone over interrogatory
17  number 3. Yeah, and I think we now have established
18  that your address with Joaquin is one 387 71st
19  Street? (sic)
20   A  Yes.
21   Q  Okay. So, did you review these
22  interrogatory answers before you signed off for
23  accuracy?
24   A  Yes.
25   Q  Okay. Then why didn't you identify Bank
```

**Page 88**

```
 1  of America in response to interrogatory number 5?
 2   A  Bank of America?
 3   Q  Yeah, that's a bank you told me before. I
 4  wrote it down.
 5   A  Well, when I went to ask for the
 6  statements. She ordered it because she said that she
 7  doesn't have -- didn't have those documents right
 8  there, and supposedly they're supposed to arrive on
 9  Monday.
10   Q  How many different bank accounts did you
11  have at the time that you are -- that you worked for
12  Collins & 74th and for which you're claiming
13  overtime?
14   A  I had Bank of America and Regions. I know
15  I had that one and I switched over to Regions.
16   Q  Why didn't you identify Bank of America on
17  your interrogatory answers?
18   A  Well, yes. I mean, those are ordered.
19   Q  How many different accounts did you have
20  at Regions?
21   A  What do you mean accounts?
22       MS. LANGBEIN: Let's make this as
23   Defendant's No. 11.
24  (Whereupon, the documents are marked as Defendant's
25       No. 11 for identification.)
```

22 (Pages 85 to 88)

```
 1   in 2014. We can eliminate 2014, correct, because you
 2   were at the bank opening an account on that day?
 3       A   I don't remember.
 4       Q   In interrogatory number 10, I asked you
 5   how you got to work each day and you only mentioned
 6   the Ford Explorer. You never mentioned the
 7   Silverado?
 8       A   Well, the Silverado didn't exist.
 9       Q   So, you never had that car during the time
10   that you worked for my client for which you're
11   claiming overtime?
12       A   Which car?
13       Q   The Silverado?
14       A   Yes.
15       Q   It's your testimony you've never been to
16   see any type of doctor, clinic, any type of medical
17   treatment or healthcare professional during the
18   period of time for which you're seeking overtime?
19       A   Yes.
20       Q   Is your date of birth 7/17/1963?
21       A   Yes.
22       Q   Okay. And is your Metro PCS cell phone
23   number 305-303-1429?
24       A   No, that was changed.
25       Q   Okay.  At the time that you opened this
```
Page 93

```
 1   account, did you have that number?
 2       A   Yes.
 3       Q   Was that also with Metro PCS?
 4       A   Metro.
 5       Q   Now, in interrogatory number 17, I asked
 6   you 'Please state all email addresses you used
 7   during the relevant time period, the name of your
 8   internet service provider, the name of all social
 9   network websites where you have established accounts
10   and your user names for such websites.' And you
11   responded none?
12       A   None.
13       Q   Do you have a smart phone?  What kind of
14   smart -- what kind of phone is that?
15       A   A Samsung.
16       Q   Okay. How long have you had that
17   telephone?
18       A   Without changing it?
19       Q   Yes.
20       A   It must have been about a year and a bit
21   since I changed it, because the other one broke.
22       Q   Do you still have the broken phone?
23       A   No.
24       Q   Okay. Can you look at the front page of
25   Defendant's No. 11, and can you explain why whoever
```
Page 94

```
 1   you dealt with at the bank wrote down an email
 2   address of na@na.com?
 3       A   No, I know nothing about that. I've never
 4   had an email or anything like that.
 5       Q   Well, all the other information on this
 6   page is correct, isn't it?
 7       A   Yes, if it's there.
 8       Q   Do you think that the lady just made that
 9   up who opened the account?
10       A   Never.
11       Q   Okay. Let's go to interrogatory number 19.
12   In that interrogatory, you were asked state the
13   manner and rate in which you were compensated each
14   week and whether any and/or all of your compensation
15   was paid in cash. "If you were compensated in full
16   or in part but with cash, state the amount of cash
17   you received each week -- for each week and the
18   relevant time period, and whether any of the cash
19   you received was deposited into a bank, credit
20   union, or other depository." And your response was,
21   "I received payments every two weeks; half was in
22   check and half was in cash. The money I received was
23   either deposited in my bank or used to pay bills."
24   Which bank?
25       A   Well, the cash I wouldn't put in the bank.
```
Page 95

```
 1       Q   What bank?
 2       A   Well, the bank that I had, the bank.
 3       Q   Would you please instruct your client to
 4   answer the question and ex -- and tell me the name
 5   of the bank where he deposited this money as he
 6   stated in his sworn interrogatories?
 7           MR. SHESKIN:  Which bank specifically did
 8   you deposit the money in?
 9           THE WITNESS:  Which money?
10           MR. SHESKIN:  When you were paid by cash
11   and check?
12           THE WITNESS:  I would cash the check at
13   Bank of America.
14   BY MS. LANGBEIN:
15       Q   That's not what your answer says, sir. And
16   I've asked you a couple times if you looked this
17   over before you signed these interrogatory answers.
18       A   I would cash the checks. And -- and the
19   Bank of America account, I just had it a -- a short
20   time.  I mean, when I would cash the checks, they
21   would charge me four or five dollars; that's why I
22   changed it.
23       Q   So, is this answer, then, incorrect? That
24   you never made deposits of your paychecks or the
25   cash into any bank account? (sic)
```
Page 96

24 (Pages 93 to 96)